UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RALPH NESBITT,                         )
                                       )
        Petitioner,                    )
                                       )        CIVIL ACTION NO.
v.                                     )        09-10615-DPW
                                       )
PETER ST. AMAND, Warden,               )
                                       )
        Respondent.                    )


MEMORANDUM AND ORDER
March 30, 2011

Petitioner Ralph Nesbitt seeks federal *habeas corpus* relief
from his convictions for murder and armed burglary in
Massachusetts state court. During the five-day trial leading to
those convictions, the trial court allowed the jury to hear
portions of a 911 call made by the murder victim, Dawne Brault,
and allowed Brault's cousin, Dennis Marcure, to testify as to
statements Brault made to him shortly before she died. The trial
court also permitted the Commonwealth to introduce inconclusive
DNA evidence taken from a bicycle found near the scene of the
murder. The Supreme Judicial Court of Massachusetts upheld the
convictions and sentence, finding that the admission of Brault's
statements did not violate the Confrontation Clause of the United
States Constitution or its state constitutional counterpart and
that the DNA evidence did not lead to a miscarriage of justice
under state law. *Commonwealth v. Nesbitt*, 892 N.E.2d 299, 302-04
(Mass. 2008).

This petition by a pro se state prisoner presents the problem of assuring fairness to the consideration of the petitioner's contentions in the complex procedural context of federal *habeas corpus* law. The specific claims expressly identified in the petition itself appear without merit. But petitioner has limned additional claims in submissions other than those raised in the petition itself. Those additional claims he is pursuing, apparently so far without success, through successive levels of the state courts.[1]

---

[1]The lengthy pendency of Nesbitt's collateral attacks in state courts appear to have tolled AEDPA's one-year statute of limitations on federal *habeas* review. By my calculations — which I must emphasize are not definitive and cannot be relied upon — Nesbitt appears to have had approximately 180 days remaining under the statute of limitations when he moved for reconsideration by the SJC. That motion currently appears to be tolling the AEDPA statute of limitations:

AEDPA establishes a one-year statute of limitations, which "shall run from . . . 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" *Burton v. Stewart*, 549 U.S. 147, 156 (2007) (*per curiam*) (quoting 28 U.S.C. § 2244(d)(1)(A)).

Nesbitt's judgment became final on December 16, 2008, which was the day after his opportunity to file for a writ of certiorari with the Supreme Court expired. *See Wall v. Kholi*, — U.S. —, 2011 WL 767700, at *2 (2011); *Jiménez v. Quartermann*, 555 U.S. 113, 129 S.Ct. 681, 685–86 (2009); *see also Foxworth v. St. Amand*, 929 N.E.2d 286, 291 (Mass. 2010) (holding that a criminal conviction and sentence becomes final under state laws when the rescript of the appellate decision is entered on the trial court's docket).

AEDPA provides that "'a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim' tolls the 1-year limitation period for filing a federal habeas petition." *Wall*, 2011 WL 767700, at *2 (quoting 28 U.S.C. § 2244(d)(2)). By my calculations on a limited record, a state collateral attack motion had tolled the statute of limitations briefly in January 2009, at the time

The Supreme Court has held that AEDPA retained the total-exhaustion requirement laid out by the plurality in *Rose v. Lundy*, 455 U.S. 509 (1982), which "stated that district courts should dismiss 'mixed petitions' . . . with exhausted and unexhausted claims." *Burton v. Stewart*, 549 U.S. 147, 154 (2007) (*per curiam*). *Lundy* further held that "petitioners with such petitions have two options. They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition" or proceed with the unexhausted claims only but "risk[] subjecting later petitions that raise new claims to rigorous procedural obstacles." *Id.* The Supreme Court has since held that, in very limited circumstances not present here, the district court may follow a third route and grant a stay and abeyance pending exhaustion of the unexhausted claims in state court. *See Rhines v.*

---

Nesbitt filed this petition on April 15, 2009, and 254 days of his statute of limitations year remained.

However, the filing of a *habeas* petition in federal court does not toll the AEDPA statute of limitations, and the statute of limitations continued to run until Nesbitt filed additional collateral motions in the Superior Court on June 9, 2009. *See Rhines v. Webber*, 544 U.S. 269, 274-75 (2005). Two further periods of non-tolling occurred in January and February 2010 and November 2010, between judgments and the filing of appeals. In total, as of the issuance of this opinion, it appears that approximately 180 days (just shy of six months) remain of Nesbitt's one-year statute of limitations for federal review of his *habeas* claims. I emphasize that this calculation is at best provisional and the parties themselves are free to press different calculations if the statute of limitations becomes an issue in some future *habeas corpus* proceeding.

*Webber*, 544 U.S. 269, 277–78 (2005). As will appear below, I denied Nesbitt's effort to invoke the stay and abeyance.

If I were to deny the *habeas* claims presented with specificity at this point, the petitioner would face the obligation of seeking leave to file a second or successive petition from the Court of Appeals under a demanding standard before he could proceed with his unexhausted claims. *See* 28 U.S.C. § 2244(b)(2); *Rhines*, 544 U.S. at 275 ("As a result of the interplay between AEDPA's 1-year statute of limitations and *Lundy*'s dismissal requirement, petitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims.").

In order to afford Nesbitt the opportunity to pursue all his claims without procedural impediments, I will, after examining his expressly framed issues, conclude that his papers read as a whole create a mixed petition. Accordingly, I will deny the petition without prejudice to timely renewal once the petitioner has completed any collateral attack in state court that he chooses to make before presenting a fully exhausted petition in this court.[2] *See Slack v. McDaniel*, 529 U.S. 473, 485–86 (2000)

---

[2]In order for Nesbitt's future exhausted petition for federal *habeas* relief to be timely filed under AEDPA, it appears he must file it within approximately 180 days of the SJC's judgment on his current pending appeal. *See supra* Note 1; *see also Burton*, 549 U.S. at 155 ("[A] petition filed after a mixed

("A habeas petition filed in the district court after an initial habeas petition was unadjudicated on its merits and dismissed for failure to exhaust state remedies is not a second or successive petition.").

## I. BACKGROUND

### A. Factual Background

In examining a petitioner's claims under § 2254, the state court's factual determinations are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The SJC recounted the facts as follows:

> Brault and Nancy Robinson were coworkers and friends. They confided in each other as they weathered turmoil in their personal lives. In the autumn of 2003, Brault was in the process of separating from her husband, Michael Brault (Michael). Robinson recently had broken off a seventeen-year relationship with Nesbitt, who was the father of Robinson's five children. In connection with their breakup, Robinson had obtained a protective order against Nesbitt.

> Nesbitt blamed Brault for "ruining [his] relationship" with Robinson, and told Robinson that "one day [Brault will] get hers." Approximately four months before the murder, Nesbitt and a friend, William Ambers, visited Brault's home. Ambers drove Nesbitt to

---

petition has been dismissed [but] *before the district court adjudicated any claims* is to be treated as any other first petition and is not a second or successive petition." (citations and internal quotation marks omitted) (emphasis in original)). Given the petitioner's relative promptness in various filings in state and federal court thus far, I do not anticipate the dismissal of his "mixed" petition adversely affecting his ability to receive federal review of all *habeas* claims he ultimately exhausts.

the home and parked in the driveway, while Nesbitt went around the house, peeking into its windows.  Brault's husband came to the door, and they engaged in a brief conversation regarding the whereabouts of Brault and Robinson.  As Ambers drove away, Nesbitt stated his intention to "do something to fix that girl," referring to Brault.

In September, 2003, Nesbitt was living in Brockton, but on the evening of October 1, he traveled to Attleboro.  At approximately 8 p.m. that evening, he was dropped off at 15 Mechanic Street, the location of Robinson's apartment, to visit his children.[] Robinson left the apartment when Nesbitt arrived, and set out in her automobile to visit Brault.

On her way, Robinson stopped at a coffee shop a short distance from 15 Mechanic Street to visit David Jorgensen, who worked as a baker there.  Jorgensen was dating Brault at the time and was a friend of Robinson. As Robinson was speaking with Jorgensen, Nesbitt walked past the shop with one of their children.  Nesbitt waited for Robinson to leave the shop and then confronted her, asking, "What are you doing with that guy?" Robinson informed Nesbitt that Jorgensen was just "a friend."  She then left for Brault's home but told Nesbitt that she was going to pick up her mother from a bingo game.

She arrived at Brault's home at 9 p.m., and remained there until approximately 11 p.m.  During that time, Robinson received a telephone call from Nesbitt, who noted that her mother was at home (across the street from 15 Mechanic Street) and asked why Robinson had lied to him.  Robinson responded by asking Nesbitt what she was supposed to say, and then refused to tell him "that [she] loved him."  At that point in the conversation, Brault laughed audibly.[]

Robinson then left Brault's home in her automobile, and headed back toward 15 Mechanic Street. She arrived at her apartment at "ten past, quarter past [eleven p.m.]," and immediately called Brault.  They spoke for approximately thirty minutes.  Ten or fifteen minutes after that conversation — between 11:50 p.m. and midnight, according to Robinson's testimony — she received a call from Nesbitt.  He asked her to come outside and speak with him and Robinson responded,

"It's twelve o'clock, and I'm not going outside. It's too dark." According to Robinson's testimony, Nesbitt then stated, "That's okay. You don't want to come outside and talk to me? You'll just never see your friend again."[] Meanwhile, across town (at 147 Wilmarth Street), Brault had just dialed 911.

Just before Brault dialed 911, her cousin and neighbor, Dennis Marcure, was standing in his bathroom and heard something unusual coming from the Brault home.[] Brault was calling for her son Eric, but she was "crying out" in a way that "sounded strange . . . [un]like her normal voice." Marcure immediately "got dressed . . . and went out to her house." On his arrival, he noticed that the front screen door was covered in a "massive amount of blood," and he quickly found Brault lying "on the floor just covered in blood," with her feet up against the screen door and her body leaning against the storm door in her front hallway. Marcure asked her what had happened and Brault told him, "Ralph did this to me, and don't let me die."

Marcure located Brault's cellular telephone, which was lying underneath her, and also dialed 911. Approximately one minute later, a fire engine drove down the street. The first responders were two emergency medical technicians with the Attleboro fire department, Steven Cutler and his partner, Frank Aussant. Cutler testified that, as he approached the house, he noticed blood "streaking down the door" and that, on further inspection, he noticed Brault lying against the door, covered in blood. Cutler took her pulse and tried to determine if she was breathing; when he rolled her over during this process, he noticed that there were a significant number of cuts to her body, which were too numerous to count. Another emergency medical technician who responded to the scene testified that Brault was breathing what is called "agonal breathing, which is just grasping for air," and "looked like she was close to taking her last breath[]."

*Nesbitt*, 892 N.E.2d at 302–04. Brault was stabbed twenty-three times and died of her wounds shortly thereafter. *Id.* at 304.

Nesbitt was arrested five hours after the murder, at approximately 5 a.m. *Id.* At the time of his arrest, he was on his way to a construction job and told the arresting officer that he had spent the night sleeping in a field not far from Robinson's home. *Id.* A spot of blood on the sweatshirt he was wearing at that time matched Brault's DNA profile. *Id.* Nesbitt was subsequently charged with murder, armed burglary, and assault in a dwelling.

## B.   The Trial

At trial, the prosecutor introduced certain evidence, the admission of which Nesbitt contended violated his federal and state constitutional rights and Massachusetts state law. The judge ruled, over objection, that the portions of Brault's 911 call in which she identified Nesbitt as her attacker were admissible as excited utterances or, alternatively, as a dying declaration. *Id.* at 307. Brault identified Nesbitt as her attacker at the beginning of the call:

> The dispatcher: "Attleboro police, recorded line."
> Brault: "Oh, God.  Hurry up and help me."
> The dispatcher: "What's the problem, ma'am?"
> Brault: "(Inaudible) just came in my house and tried to
>   kill me."
> The dispatcher: "Who came in? Hello?"
> Brault: "Hello.  Help me."
> The dispatcher: "Are you going to answer my questions
>   so we can?  What's your address?"
> Brault: "147 Wilmarth Street."
> The dispatcher: "And who came in?"
> Brault: "Ralph Nesbitt."

*Id.* at 307 n.13.[3]   The judge similarly allowed evidence of

---

[3]The 911 call in full, as transcribed in the SJC's opinion, is as follows:

The dispatcher: "Attleboro police, recorded line."
Brault: "Oh, God.  Hurry up and help me."
The dispatcher: "What's the problem, ma'am?"
Brault: "(Inaudible) just came in my house and tried to kill me."
The dispatcher: "Who came in? Hello?"
Brault: "Hello.  Help me."
The dispatcher: "Are you going to answer my questions so we can?  What's your address?"
Brault: "147 Wilmarth Street."
The dispatcher: "And who came in?"
Brault: "Ralph Nesbitt."
The dispatcher: "And you're at 127 Wilmarth Street?"
Brault: "Yeah."
The dispatcher: "Do you need a rescue?"
Brault: (Inaudible)
The dispatcher: "Hello."
Brault: (Inaudible)
The dispatcher: "Do you need a rescue?"
Brault: "I need it now."
The dispatcher: "Okay."
Brault: "Please hurry."
The dispatcher: "Is he still there?"
Brault: "No. Hurry. Hurry up."
The dispatcher: "887 to 3A and 7A."
Brault: "Hurry up.  (Inaudible)"
The dispatcher: "Start heading to 127 Wilmarth Street, 1-2-7 Wilmarth Street."
The dispatcher: "Ma'am, do you need a rescue?"
Brault: "Yes.  I need it now."
The dispatcher: "Okay.  Stay on the line."
Brault: "Oh, he beat the [expletive] out of me."
The dispatcher: "127 Wilmarth Street, I need a rescue.  It sounds like it might be a domestic.  Okay.  They're getting there.  127 Wilmarth."
Brault: "147."
The dispatcher: "Okay. Where did he go, ma'am?"
Brault: "I don't know."
The dispatcher: "What's your name?"
Brault: "Dawne."
The dispatcher: "What's your last name?"
Brault: "Brault.  Hurry.  Hurry."
The dispatcher: "What is your last name?"

Brault's statements to her relative and neighbor, Marcure, in
which she again identified Nesbitt as her attacker. *Id.* at 307.
The subsequent 911 call by Marcure and the portion of Brault's
911 call in which the dispatcher suggests that the incident may
be "a domestic," however, were excluded as testimonial hearsay
under *Crawford v. Washington*, 541 U.S. 36 (2004). *Nesbitt*, 892
N.E.2d at 308 n.14.

The trial judge also permitted the Commonwealth's DNA expert
to testify regarding DNA evidence found on a bicycle allegedly
used by Nesbitt to travel to and from the scene of the murder.
*Id.* at 302. The expert testified that the test results for those
samples were inconclusive but that she could not rule out Nesbitt
or Brault as the origin of the samples. *Id.* at 312 & n.8. Cross
examination of the expert revealed that the results also could
not rule out the expert herself — or anyone else, for that matter

---

Brault: "Brault."
The dispatcher: "Spell it for me."
Brault: "I can't."
The dispatcher: "Okay. Try to say it a little slower
    and a little calmer, then."
Brault: "I can't talk (inaudible). Oh. Hurry up. I
    don't want to die."
The dispatcher: "Is he there?"
Brault: "Hurry. Please hurry."
The dispatcher: "Yep."
Brault: "Oh."
The dispatcher: "Is he still there?"
Brault: "No. Oh."
The dispatcher: "Okay. What kind of injury do you
    have?"
Brault: "I don't know. I don't — I can't — oh."
*Nesbitt*, 892 N.E.2d at 307 n.13.

— as the origin of the samples. *Id.* at 313. In his closing argument, the prosecutor conceded that "the DNA was from 'such a contaminated sample, it could be you, me, anybody associated with this case, or anybody else.'" *Id.* at 314. Nesbitt did not object to the admission of this testimony at trial.

On March 29, 2005, a jury convicted Nesbitt of first-degree murder and armed burglary in violation of Mass. Gen. Laws ch. 265, § 1, and ch. 266, § 14, and the government filed a *nolle prosequi* motion with respect to the remaining assault charge. The judge sentenced Nesbitt to a mandatory life sentence for the murder conviction and a concurrent, ten-year period of incarceration for the armed burglary conviction.

C.   **The Direct Appeal**

On direct appeal, Nesbitt asserted three errors of law: (1) that admission of Brault's identification of Nesbitt as her attacker in the 911 call violated his rights under the Confrontation Clause of the U.S. Constitution and article XII of the Massachusetts Bill of Rights; (2) that admission of Brault's statements to Marcure identifying Nesbitt violated his Confrontation Clause and article XII rights; and (3) that the testimony regarding the inconclusive DNA evidence resulted in a miscarriage of justice.[4]   The Massachusetts Appeals Court

_____

[4]Because Nesbitt failed to object to the admission of this evidence at trial, the SJC considered the claim under this more deferential standard of review. *Nesbitt*, 892 N.E.2d at 312

dismissed the appeal by rescript on August 7, 2006, and the SJC rejected these contentions and affirmed the convictions and sentence on August 18, 2008.

In a lengthy, published opinion, the SJC examined Nesbitt's Confrontation Clause claims under the rubric of *Crawford*, which had been decided before Nesbitt's trial; *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court's subsequent Confrontation Clause case; and *Commonwealth v. Gonsalves*, 833 N.E.2d 549 (Mass. 2005), *cert. denied*, 548 U.S. 926 (2006), which was the SJC's first opinion interpreting *Crawford*. *Nesbitt*, 892 N.E.2d at 305-06 & n.11. The SJC concluded that Brault's statements during the 911 call and to Marcure were nontestimonial in nature and, therefore, not subject to *Crawford*'s restrictions. *Id.* at 309-10. The SJC also found both statements admissible under Massachusetts law as excited utterances and that the statements to Marcure were alternatively admissible under a dying declaration exception to both the hearsay rules and the Confrontation Clause. *Id.* at 309-11. With respect to the inconclusive DNA evidence, the SJC acknowledged that the admission was "at a minimum, prejudicial," but ultimately found that its admission "did not create a substantial likelihood of a miscarriage of justice in this case" because both defense counsel

(citing *Commonwealth v. Mathews*, 882 N.E.2d 833, 840 (Mass. 2008)).

12

and the prosecutor "thoroughly and effectively challenged" the reliability of the evidence. *Id.* at 313–14. Accordingly, the SJC affirmed the convictions and sentence. *Id.* at 314.

## D. Collateral Attacks

After unsuccessfully seeking a new trial and *habeas* relief in Superior Court, Nesbitt filed this federal *habeas* petition under 28 U.S.C. § 2254 on April 15, 2009. In his petition, he again raised the two Confrontation Clause claims and challenged the admission of the DNA evidence under state law. In May 2009, Nesbitt sought to stay these federal proceedings in order to exhaust additional ineffective assistance of counsel claims in state court. Because Nesbitt failed to raise the ineffective assistance claims in state court previously or establish good cause for not doing so, I denied the motion to stay on March 2, 2010. *See Rhines*, 544 U.S. at 277 (holding that stay and abeyance is only appropriate where "there was good cause for the petitioner's failure to exhaust his claims first in state courts" and the unexhausted claims are not "plainly meritless"). It appears from state court dockets that, in January 2010, the Superior Court had denied Nesbitt's postconviction motions and that the SJC denied leave to appeal by a single-judge order on November 15, 2010. An appeal of that single-judge order appears now to be pending in the SJC. Meanwhile, the respondent has moved for judgment on the pleadings in this case.

## II. STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, a federal court may consider a petition for *habeas* relief filed by a state prisoner only if it is based upon a violation of "the Constitution or laws . . . of the United States."  28 U.S.C. § 2254(a).  A federal court undertaking such consideration may grant federal *habeas* relief when the state court's decision on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has held that "clearly established federal law" only "refers to the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

As the United States Supreme Court has explained, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Id.* at 413; *see also*

14

*Janosky v. St. Amand*, 594 F.3d 39, 47 (1st Cir. 2010). By
contrast, an unreasonable application of clearly established
federal law occurs "if the court identifies the correct governing
legal principle from [the Supreme] Court's cases but unreasonably
applies it to the facts of the . . . prisoner's case." *Williams*,
529 U.S. at 407. The state court's decision must be objectively
unreasonable, and not merely incorrect or erroneous. *Id.* at 409;
*see also Grant v. Warden, Me. State Prison*, 616 F.3d 72, 76 (1st
Cir. 2010) ("Under this deferential standard, the state court's
decision is not vulnerable unless it evinces some increment of
incorrectness beyond mere error." (citation and internal
quotation marks omitted)).

### III. ANALYSIS

Of Nesbitt's four asserted grounds for *habeas* relief
identified in petitioner's submissions in this case, only the two
Confrontation Clause claims would be appropriate for federal
*habeas* review at this time.

AEDPA does not permit relief for violations of state law,
and, consequently, Nesbitt's claim that the admission of
inconclusive DNA evidence created a miscarriage of justice under
Massachusetts state evidence law must fail. Nesbitt argues that
the DNA evidence was "speculative and irrelevant" and should have
been excluded under *Commonwealth v. Mathews*, 882 N.E.2d 833
(Mass. 2008), and its progeny. He makes no contention that the

admission of this evidence violated the United States
Constitution or federal law. Because this asserted ground is
based entirely upon an alleged violation of state law, I cannot
and do not review whether the SJC's ruling on this claim was
erroneous. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t
is not the province of a federal *habeas* court to reexamine
state-court determinations on state-law questions. In conducting
*habeas* review, a federal court is limited to deciding whether a
conviction violated the Constitution, laws, or treaties of the
United States." (citations omitted)). Therefore, even if the
admission of the DNA evidence were improper under Massachusetts
law, it is not a cognizable ground for federal *habeas* relief.
*See Santiago v. O'Brien*, 628 F.3d 30, 33 (1st Cir. 2010) ("An
error of state law standing alone is not sufficient for habeas
relief." (citing *Estelle*, 502 U.S. at 67–68)).

I similarly have no jurisdiction under § 2254 to review
Nesbitt's belated suggestion in his motion to stay papers of
ineffective assistance of counsel claims. Nesbitt does not
dispute that these claims were not properly raised in state court
until after his federal *habeas* petition had been filed.[5] As

---

[5]Nesbitt initially filed post-conviction motions for a new
trial and *habeas corpus* on January 15, 2009, but the Superior
Court denied the motions without prejudice because they failed to
comply with Mass. Super. Ct. Rule 61A. After filing this federal
petition on April 15, 2009, Nesbitt filed fresh motions for a new
trial and *habeas* relief in Superior Court on June 9, 2009. Notes
entered on the Superior Court docket indicate that Nesbitt raised

previously explained, AEDPA bars review of such unexhausted claims. *See* 28 U.S.C. § 2254(b)(1)(A); *Burton*, 549 U.S. at 153-54 (discussing *Lundy*, 455 U.S. at 510-22).

Thus, the only claims unaffected by AEDPA's jurisdictional bars are the two Confrontation Clause claims regarding Brault's out-of-court statements identifying Nesbitt. Both of these claims were properly exhausted in state court and timely raised in Nesbitt's § 2254 petition. My observations regarding those claims follow: I will address first the 911 call and then Brault's statements to Marcure.

## A. Confrontation Clause

The Sixth Amendment guarantees a criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In its 2004 *Crawford* opinion, the Supreme Court "effected a sea change in the jurisprudence of the Confrontation Clause." *United States v. Brito*, 427 F.3d 53, 55 (1st Cir. 2005). Specifically, the Court rejected its previous reliability-centered approach to the Confrontation Clause. *Crawford*, 541 U.S. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence,

---

the ineffective assistance of counsel claims for the first time in that court in the June 9 motions. The same claims were raised first in this court on May 26, 2009, when Nesbitt moved to stay proceedings in order to exhaust the claims in state court. These claims remain unresolved.

much less to amorphous notions of 'reliability.'"); *see also Brito*, 427 F.3d at 58 ("[T]he *Crawford* Court decreed that, as to 'testimonial' statements, the Confrontation Clause assures a procedural right to confrontation rather than a substantive guarantee of evidentiary reliability.").

The *Crawford* Court held that, under the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court noted that forfeiture by wrongdoing remained an exception on equitable grounds and left open the question whether the common-law dying declaration remained another exception to the Confrontation Clause's protections. *Id.* at 56 n.6, 62. The Court explained that "[w]here *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* at 68 (emphasis added); *see also United States v. Figueroa-Cartagena*, 612 F.3d 69, 84 (1st Cir. 2010) ("Nontestimonial statements . . . do not cause the declarant to be a witness within the meaning of the Sixth Amendment and thus are not subject to the Confrontation Clause." (citing *Davis*, 547 U.S. at 821) (internal quotation marks omitted)). Consequently, the Confrontation Clause inquiry has come to focus on whether the challenged out-of-court

statements are testimonial in nature.  *Crawford*, 541 U.S. at
51–52.

While the Court in *Crawford* "le[ft] for another day any
effort to spell out a comprehensive definition of 'testimonial,'"
*Brito*, 427 F.3d at 55, a subsequent Confrontation Clause decision
provided limited guidance, *see Davis*, 547 U.S. at 822.  In *Davis*,
the Court considered two cases raising *Crawford* claims: one
involving a victim's statements to a 911 dispatcher, the second
examining a victim's statements to police questioning at the
scene of a purported domestic dispute.

Although *Crawford* suggested that statements made during
police interrogation are testimonial *per se*, *Crawford*, 541 U.S.
at 52, the *Davis* Court held that "[s]tatements are nontestimonial
when made in the course of police interrogation under
circumstances objectively indicating that the primary purpose of
the interrogation is to enable police assistance to meet an
ongoing emergency," *Davis*, 547 U.S. at 822; *see also id.* at 826
(distinguishing *Crawford*, in which "we had immediately in mind
(for that was the case before us) interrogations solely directed
at establishing the facts of a past crime, in order to identify
(or provide evidence to convict) the perpetrator").  By contrast,
statements "are testimonial when the circumstances objectively
indicate that there is no such ongoing emergency, and that the
primary purpose of the interrogation is to establish or prove

past events potentially relevant to later criminal prosecution."
*Id.; see also Michigan v. Bryant*, 131 S.Ct. 1143, 1155 (2011)
("[T]he most important instances in which the Clause restricts
the introduction of out-of-court statements are those in which
state actors are involved in a formal, out-of-court interrogation
of a witness to obtain evidence at trial.").

The Supreme Court's recent opinion in *Michigan v. Bryant*
affirmed this primary-purpose approach to its post-*Crawford*
Confrontation Clause jurisprudence. The Court in *Bryant*
considered whether statements made to police shortly after they
arrived to assist a gunshot victim were testimonial. The *Bryant*
Court held that *Davis* had directed courts to engage in a "primary
purpose" inquiry to determine whether the primary purpose of the
interrogation was to create a record for trial or was for some
other purpose, such as responding to an ongoing emergency, in
which case "the admissibility of a statement is the concern of
state and federal rules of evidence, not the Confrontation
Clause." *Bryant*, 131 S.Ct. at 1155.

In reviewing the SJC's decision under AEDPA, I must, of
course, look to the Supreme Court's controlling precedent as it
was at the time the SJC ruled on the issue. As of the time of
the SJC's ruling, this was expressed in the Supreme Court's
opinions in *Crawford*, *Davis*, and *Giles v. California*, 554 U.S.
353, 359 (2008). Obviously, *Bryant*, decided last month, post-

dates the SJC's *Nesbitt* opinion. However, because *Bryant*
reflects the Supreme Court's holdings in the prior cases — in
particular, its interpretation of *Davis* — this most recent
Supreme Court opinion in the area remains instructive here.

**1. Brault's Statements to the 911 Dispatcher**

The SJC's analysis of Nesbitt's Confrontation Clause claims
hewed closely to *Davis*, in which the Supreme Court also addressed
whether identifying statements made during a 911 call constituted
testimony within the meaning of the Confrontation Clause. As did
the Court in *Davis*, the SJC found the victim's statements in the
911 calls to be nontestimonial and, therefore, admissible. The
SJC outlined its approach to Nesbitt's Confrontation Clause
challenges, establishing that each statement "[f]irst . . . must
'be evaluated for admissibility under normal evidence rules,
*i.e.*, whether it qualifies as a hearsay exception,'" and, if it
does, "the statement must be appraised under the criteria of
*Crawford-Davis* and [*Gonsalves*] to determine if it satisfies the
confrontation clause of the Sixth Amendment." *Nesbitt*, 892
N.E.2d at 306 (citing *Commonwealth v. Burgess*, 879 N.E.2d 549
(Mass. 2005)) (additional citations omitted). The SJC further
acknowledged that the "*Crawford-Davis-Gonsalves* inquiry is itself
a two-step procedure for distinguishing testimonial from
nontestimonial statements" and requires a reviewing court to
determine whether the statements at issue are testimonial *per se*

or, if not, whether the statements are testimonial in fact. *Id.* (citations omitted). Nontestimonial statements, the SJC correctly recognized, "do not give rise to a right of confrontation and may be admitted if the admission is consistent with Massachusetts evidence law." *Id.* at 307 (citing *Crawford*, 541 U.S. at 68–69).

The approach that the SJC followed is nearly identical to the approach that the First Circuit has applied in its own post-*Crawford* Confrontation Clause jurisprudence. In *Brito*, the First Circuit outlined two "parallel inquiries" to determine on an "*ad hoc*, case-by-case" basis whether a statement qualifies as an excited utterance exception to the hearsay rules under state evidence law and, additionally, "whether a reasonable declarant, similarly situated (that is, excited by the stress of a startling event), would have had the capacity to appreciate the legal ramifications of her statement." *Brito*, 427 F.3d at 61–62 (deciding, before *Davis*, that statements made in a 911 call were not testimonial in that case because of the "immediacy of the threat"); *see also United States v. Earle*, 488 F.3d 537, 542 (1st Cir. 2007) ("*Crawford* analysis generally requires a court to consider two threshold issues: (1) whether the out-of-court statement was hearsay, and (2) whether the out-of-court statement was testimonial.").

The SJC examined Brault's 911 call in great detail and
affirmed the trial court's determination that Brault's statements
in that setting qualified as spontaneous utterances under
Massachusetts law.  *See Nesbitt*, 892 N.E.2d at 307-09.[6]  The SJC
went on to consider the 911 call under the *Crawford-Davis* rubric
and concluded that Brault's statements were nontestimonial
because, although they were made to law enforcement (the 911
dispatcher), viewed objectively, they were aimed at enabling
police to react to an ongoing emergency.  *Id.* at 308-09.  In so
finding, the SJC emphasized Brault's precarious medical
condition; her inability to speak and answer certain questions;
her urgent calls for help; the need for responders to know
whether the attacker continued to present a risk to Brault, the
responders, or the public; and the brief period of time that had
elapsed since the attack.  *Id.*  The SJC observed that Brault's
statements were "plainly a call for help against a *bona fide*
physical threat," and that the 911 caller's questions, "viewed
objectively, were aimed at resolving the present emergency and
not at conducting an investigation of past events."[7]  *Id.* at 309.

---

[6]Nesbitt appears not to dispute this evidentiary finding
and, in any case, I find no basis for dispute that Brault's 911
call occurred "in circumstances that reasonably negated
premeditation."  *Commonwealth v. Santiago*, 774 N.E.2d 143, 147
(Mass. 2002).

[7]The SJC also determined that "Brault's statement to the 911
operator might also qualify as a dying declaration."  *Nesbitt*,
892 N.E.2d at 208 n.14.

Nesbitt argues that while Brault's statements regarding her address and medical condition were admissible under *Davis*, her identification of Nesbitt constituted inadmissible testimony because it was "not necessary in order to receive assistance." Nesbitt contends that because Brault's assailant had fled the scene, his identification was irrelevant and both Brault and the dispatcher knew that the statements would be used to investigate and prosecute the assailant.  Because there was no longer an ongoing emergency, he maintains, the purpose of the identification was more like the statements in *Crawford*, generated for establishing or proving some past fact.

Nesbitt accurately notes that Brault's 911 call took place after the attack, once the assailant had fled the scene, and so it was unlike the *Davis* call to the extent that Brault was not "speaking about events *as they were actually happening*." *Davis*, 547 U.S. at 827 (emphasis in original).  However, the cessation of the attack itself does not necessarily effect a cessation of the emergency.  *See Bryant*, 131 S.Ct. at 1158 ("The Michigan Supreme Court erroneously read *Davis* as deciding that 'the statements made after the defendant stopped assaulting the victim and left the premises did *not* occur during an "ongoing emergency."'" (emphasis in original)).  When an armed assailant remains at large, he may pose a risk to the victim or the responders (should he return) or to the public (should he

24

continue his violent attacks against others). *See id.* at
1158-59.

Two federal appellate cases (pre-dating *Bryant*) similarly
found that statements made by victims shortly after the attacker
fled were nontestimonial because they were made for the purpose
of enabling a response to an emergency situation.

In *Colon v. Taskey*, No. 09-3808, 2010 WL 4569877, at *1 (6th
Cir. Nov. 4, 2010) (unpublished opinion), the state courts had
found the statements admissible under the excited utterance
exception, but the federal district court had granted a writ of
*habeas corpus* on the grounds that the statements were testimonial
because the emergency was no longer ongoing.  The Sixth Circuit
reversed, finding that the statements were nontestimonial — as in
*Davis* — because, "[i]n both cases, a still-distressed victim was
interviewed by police officers while her alleged assailant was at
large [and] the police asked questions 'in order to assess the
situation,' to learn 'whom they [were] dealing with,' and to
ascertain the 'possible danger to the potential victim.'" *Id.* at
*4 (quoting *Davis*, 547 U.S. at 832).

Similarly, in *United States v. Proctor*, 505 F.3d 366 (5th
Cir. 2007) (*per curiam*), the Fifth Circuit found that identifying
statements made during a 911 call were nontestimonial because
they were made during an ongoing emergency, despite the fact that
the defendant — who had shot a gun into the ground twice and run

25

off – had not specifically threatened the declarant and had fled the area. 505 F.3d at 371-72 (noting that the identity and criminal history of the defendant was necessary for the responders to understand the risk to the public and themselves).

The SJC also did not appear to err in considering Brault's medical condition relevant to whether she was — or was capable of being — cognizant that her statements could or would be used in the investigation or prosecution of her attacker. The formality of the interrogation was one of the factors that the *Davis* Court found relevant in determining whether the purpose of the interrogation was to elicit testimony or information necessary to assist. *Davis*, 547 U.S. at 827. The *Davis* Court determined that the 911 call at issue was informal — and nontestimonial — because the victim's "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.*

The *Bryant* Court reaffirmed the importance of the formality factor, criticizing the Michigan Supreme Court for "not sufficiently account[ing] for . . . the importance of *informality* in an encounter between a victim and police." *Bryant*, 131 S.Ct. at 1160 (emphasis in original). By contrast, the statements at issue in *Davis*'s companion case, *Hammon*, were found to be testimonial in part because the calm, secure environment in which the questioning took place rendered the interrogation more like

formal police investigations aimed at recounting past events. *Davis*, 547 U.S. at 830.

The SJC found that Brault's 911 call was extremely informal, like the 911 call in *Davis*, because Brault was severely wounded, could barely talk and could not spell her name, and repeatedly pleaded for assistance. *Nesbitt*, 892 N.E.2d at 308-09. Such a finding is wholly consistent with the Supreme Court's case law.

The Supreme Court has recognized, however, as Nesbitt suggests, that a conversation's purpose may evolve from one primarily focused on emergency response to one focused on information gathering for testimonial purposes. *Davis*, 547 U.S. at 828; *Bryant*, 131 S.Ct. at 1159-60. Nevertheless, after reviewing the transcript of the 911 call in this case, *see supra* note 3, it appears clear that the dispatcher was inquiring about Brault's attacker to determine whether he is still present. Because Brault was understandably confused and hysterical, the dispatcher was forced to repeat her inquiry to determine the scope of the emergency in order to dispatch effective assistance. *See Nesbitt*, 892 N.E.2d at 308. Therefore, Brault's identifying statements cannot be excised from the information required to respond to the emergency, as Nesbitt contends. The statements appear to be nontestimonial and, consequently, admissible under "clearly established federal law."

As the Supreme Court has recently noted, "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant*, 131 S.Ct. at 1158. In Nesbitt's case, the SJC followed *Crawford* and *Davis*, and its decision — in the face of facts not meaningfully dissimilar from those presented by *Davis* and *Bryant* — appears consistent with those opinions. The SJC objectively evaluated the context of the 911 call and what purpose a reasonable person in either Brault's or the dispatcher's position would have had during the conversation. The SJC determined that a reasonable person in Brault's position would not be thinking as a testifying witness, but rather as a crime victim seeking immediate medical assistance, and that the dispatcher would be soliciting information primarily to enable emergency responders to safely and effectively provide that assistance. *Nesbitt*, 892 N.E.2d at 308–09; *cf. Bryant*, 131 S.Ct. at 1156 (holding that courts should apply an objective inquiry to determine "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and circumstances in which the encounter occurred").

Thus, the SJC does not appear to have unreasonably applied *Crawford* or *Davis* by determining that the 911 dispatcher's questioning regarding the identity and whereabouts of the attacker were nontestimonial because they were aimed primarily at responding to an ongoing emergency. *See Davis*, 547 U.S. at 827

(finding that the 911 dispatcher's questions regarding the assailant's identity were necessary to resolve the emergency "so that the dispatched officers might know whether they would be encountering a violent felon").

**2. Brault's Statements to Marcure**

In his brief to the SJC, Nesbitt argued that because Marcure specifically asked Brault who had attacked her, Marcure knew that he was soliciting information for investigation and prosecution. As a consequence, Nesbitt contends, her response was testimonial in nature. The law regarding whether statements to relatives or other non-law enforcement personnel can be testimonial remains unsettled. *Bryant*, 131 S.Ct. at 1155 n.3 (reserving, again, the question of "whether and when statements made to someone other than law enforcement personnel are 'testimonial'" (quoting *Davis*, 547 U.S. at 823 n.2)). For this reason, the SJC's analysis of Brault's statements to Marcure focused primarily on the admissibility of the statements as a dying declaration. *Nesbitt*, 892 N.E.2d at 310. I will similarly address the SJC's reasoning on this ground.

The SJC first determined that, for the same reasons that Brault's statements to the 911 dispatcher were nontestimonial, so were her statements to Marcure, who arrived on the scene after Brault's call but before first responders had arrived. *Id.* The SJC then concluded that Brault's statements to Marcure were

admissible as dying declarations and, as such, "would not, in our view, be contrary to Nesbitt's constitutional right of confrontation."[8]  *Id.*  The SJC recognized that whether the Confrontation Clause permits dying declarations to be admitted even if they are testimonial remains unsettled after *Crawford*. *Id.*  The SJC first pointed to the language in *Crawford* that suggests that dying declarations may be "*sui generis*" exceptions to the Confrontation Clause because a common law exception for dying declarations predated the Sixth Amendment.  *Id.* (citing *Crawford*, 541 U.S. at 54, 56 n.6).  The SJC then examined state Supreme Court opinions that had addressed the issue and had recognized such an exception post-*Crawford*.  *See id.* at 310–11. The SJC ultimately concluded that "Brault's statement, therefore, may properly be considered a common-law dying declaration, and was properly admitted regardless of whether it was testimonial in nature."  *Id.* at 311.

As the SJC correctly noted, there is no Supreme Court precedent directly addressing the dying declaration exception post-*Crawford*.  The Court has suggested that the exception may exist, but has consistently declined to resolve the issue.  *See Bryant*, 131 S.Ct. at 1151 n.1.  In *Giles*, however, the Court's

---

[8]Nesbitt does not contest the SJC's finding that Brault's statements to Marcure qualify as dying declarations under Massachusetts law.  I will assume, as does Nesbitt, that the statements were dying declarations.

analysis of the status of the forfeiture-by-wrongdoing exception
to the right of confrontation indicates that the dying
declaration exception will likely survive *Crawford*. *See Giles*,
554 U.S. at 359. The *Giles* Court examined "whether the theory of
forfeiture by wrongdoing accepted by the California Supreme Court
is a founding-era exception to the confrontation clause." *Id.* at
358. In doing so, the Court recognized that, "at the time of the
founding," only "two forms of testimonial statements were
admitted at common law, even if they were unconfronted": dying
declarations and forfeiture by wrongdoing. *Id.* at 358–59.
Ultimately, the Court reserved the issue of dying declarations,
but the analysis — and rejection — of California's unique
forfeiture-by-wrongdoing exception based on what existed at
common law at the founding suggests that dying declarations would
be admissible even if testimonial. *See id.* at 361–62 ("In cases
where the evidence suggested that the defendant had caused a
person to be absent, but had not done so to prevent the person
from testifying — as in the typical murder case involving
accusatorial statements by the victim — the testimony was
excluded unless it was confronted or fell within the dying-
declarations exception.").

In his brief to the SJC, Nesbitt conceded that "[t]he
Supreme Court left open the question whether dying declarations
were an exception to the Sixth Amendment's requirement of

confrontation." Nesbitt argues, however, that the reasoning of *Crawford* "compels the conclusion that such declarations violated the Sixth Amendment." In the context of AEDPA review, however, I may only look at whether the SJC's decision was contrary to or an unreasonable application of *clearly established* federal law, as established in the *holdings of the Supreme Court*. *See Williams*, 529 U.S. at 412. "[A] state court does not act contrary to or unreasonably apply clearly established federal law if there is no controlling Supreme Court holding on the point." *Losh v. Fabian*, 592 F.3d 820, 823 (8th Cir. 2010); *see also Dagley v. Russo*, 540 F.3d 8, 13 (1st Cir. 2008) ("The rule relied upon by the petitioner for relief must be 'clearly established law as determined by th[e] [Supreme] Court,' which refers to holdings, not *dicta*." (citation omitted) (alteration in original)). It is not within the writ of an inferior federal *habeas* court to resolve legal questions expressly left unresolved by the Supreme Court.

It appears the SJC did not unreasonably apply *Crawford* and *Davis*, and Nesbitt's claim for *habeas* relief on this ground should fail. *See Gilmore v. Lafler*, No. 2:07-cv-14010, 2010 WL 2560034, at *11 (E.D. Mich. June 15, 2010) ("Because the Supreme Court's refusal to decide the admissibility of dying declarations leaves the law not clearly established, the AEDPA standard precludes *habeas* relief."). My view in this regard is consistent

with other courts that have addressed the dying declaration

exception post-*Crawford/Davis*.  *See, e.g.*, *Martin v. Fanies*, 365

F. App'x 736, 738 (5th Cir. 2010) (*per curiam*) ("Given the state

of the federal law [regarding the dying declaration exception],

the Minnesota Supreme Court's decision to apply the United States

Supreme Court's *dicta* as stated in *Crawford* itself and repeated

in *Giles* was not objectively unreasonable."); *Saldivar v.*

*McGrath*, No. EDCV 03-1384, 2010 WL 4008344, at *8 n.7 (C.D. Cal.

Aug. 20, 2010), *adopted by* 2010 WL 3985584 (Oct. 6, 2010); *Walker*

*v. Harry*, No. 2:07-CV-14133, 2010 WL 2804934, at *5-6 (E.D. Mich.

July 15, 2010); *Paul v. Ercole*, No. 07 Civ. 9462(CM)(HBP), 2010

WL 3899645, at *11 (S.D.N.Y. June 10, 2010), *adopted by* 2010 WL

2884720 (S.D.N.Y. July 21, 2010); *Leighton v. Sribner*, No. CV 08-

4552-GW(RNB), 2009 WL 6441470, at *17 (C.D. Cal. Dec. 4, 2009),

*adopted by* 2010 WL 1849368 (C.D. Cal. May 6, 2010); *Young v.*

*Symmes*, No. 06-4246, 2008 WL 4748569, at *3 (D. Minn. Oct. 28,

2008).[9]

---

[9]Nesbitt relies heavily on *United States v. Jordan*, No. 04-CR-229-B, 2005 WL 513501, at *3 (D. Colo. Mar. 3, 2005), which found that "there is no rationale in *Crawford* or otherwise under which dying declarations should be treated differently than any other testimonial statement." *Jordan* is inapposite, however, for several reasons.  First, the district court in *Jordan* was ruling on a motion *in limine* to exclude out-of-court statements and consequently was not employing the deferential review required by AEDPA.  Second, the opinion concentrates primarily on the policy implications of the dying declaration exception.  *Id.* at *3-4. Such a concern, while relevant to the question whether the dying declaration *should* be an exception, has no bearing on whether the dying declaration *was* an exception under *Crawford* at the point

### IV. DISPOSITION

While my observations regarding the exhausted claims presented by petitioner detail my view that they are without merit, and my denial of the motion to stay was premised on the view that AEDPA's objectives would be frustrated while awaiting resolution of apparently meritless claims moving toward exhaustion in the state courts, *see generally Rhines*, 544 U.S. at 277–78, I choose to dismiss the instant petition for failure of complete exhaustion, *Lundy*, 455 U.S. at 522. I do so to avoid a "'trap [for] the unwary *pro se* prisoner,'" *id.* at 520 (citation omitted), who will have the opportunity to present a completely exhausted petition in a timely fashion should he choose to do so.

### V. CONCLUSION

For the reasons set forth more fully above, I direct the clerk to DISMISS without prejudice Nesbitt's *habeas corpus*

---

*Nesbitt* was decided by the SJC. The SJC distinguished *Jordan* on similar grounds. *See Nesbitt*, 892 N.E.2d at 311. Finally, the *Jordan* court's reasoning conflicts with *Crawford* itself. The *Jordan* court determined that the dying declaration exception could not exist under *Crawford* because such an exception "was not existence at the time the Framers designed the Bill of Rights." *Jordan*, 2005 WL 513501, at *4. The Supreme Court however suggested in *Crawford*, and found in *Giles*, that the dying declaration *was* one of only two common law exceptions to the confrontation requirements at the founding. *See Giles*, 554 U.S. at 358–59; *Crawford*, 541 U.S. at 56 n.6. Nesbitt's reliance on *Jordan* here, therefore, is misplaced.

petition because it presented a mixed petition.  *See generally* 28 U.S.C. § 2254(b)(1)(A); *Rose v. Lundy*, 455 U.S. 509 (1982).


         ***/s/ Douglas P. Woodlock***
         DOUGLAS P. WOODLOCK
         UNITED STATES DISTRICT JUDGE